Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued February 13, 2003       Decided March 14, 2003

No. 01-5449

AID ASSOCIATION FOR LUTHERANS,
APPELLEE

v.

UNITED STATES POSTAL SERVICE,
APPELLANT

————

Consolidated with
03-5065

————

No. 01–5450

AMERICAN BAR ENDOWMENT,
APPELLEE

v.

UNITED STATES POSTAL SERVICE,
APPELLANT

————

Consolidated with
03-5066

————

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Appeals from the United States District Court
for the District of Columbia
(No. 96cv02694)
(No. 97cv00660)

————

*Edward Himmelfarb*, Attorney, United States Department of Justice, argued the cause for appellant. With him on the briefs were *Roscoe C. Howard, Jr.*, United States Attorney, and *Anthony J. Steinmeyer*, Assistant Director, United States Department of Justice. *R. Craig Lawrence* and *Vincent H. Cohen, Jr.*, Assistant United States Attorneys, entered appearance.

*Geoffrey W. Peters* argued the cause and filed the brief for appellee Aid Association for Lutherans.

*William J. Olson, John S. Miles*, and *Herbert W. Titus* were on the brief for *amicus curiae* Free Speech Defense and Education Fund, Inc. in support of appellee.

*Sheila J. Carpenter* argued the cause for appellee American Bar Endowment. With her on the brief was *Richard Littell*.

Before: EDWARDS, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: The 1990 amendment to the Postal Reorganization Act of 1970 ("PRA") bars the use of the reduced nonprofit third-class postage rate for mailings promoting any insurance policy if "the coverage provided by the policy" is "generally otherwise commercially available." 39 U.S.C. § 3626(j)(1)(B). In 1992, appellant United States Postal Service ("Postal Service" or "USPS") issued regulations construing this statutory language to bar the use of the reduced rate for mailings promoting insurance of a general type (*e.g.*, life, automobile, health) that is commercially available. *See* 57 Fed. Reg. 28,464, 28,466 (June 25, 1992). Under the regulations, the Postal Service decided that appellees Aid Association for Lutherans ("AAL") and American Bar Endowment ("ABE"), both nonprofit, tax-exempt organizations that offer insurance policies to their members and are eligible

for the nonprofit postage rate, were no longer entitled to mail their insurance-related material at the nonprofit rate to the extent that the insurance offered was of a general type that is otherwise commercially available.

Appellees filed separate law suits in the District Court, alleging that the Postal Service exceeded its statutory authority in promulgating the cited regulations. The District Court granted judgment for appellees, finding that the regulations "constitute an impermissible reading of the statute." *Aid Ass'n for Lutherans v. USPS*, No. 96-2694, Mem. Op. at 13 (D.D.C. Sept. 13, 2001) ("*AAL* Mem. Op."), *reprinted in* Joint Appendix ("JA") 157, 169; *Am. Bar. Endowment v. USPS*, No. 97-660, Mem. Op. at 6 (D.D.C. Sept. 17, 2001) ("*ABE* Mem. Op.") (finding the "identical analysis" to apply), *reprinted in* JA 384, 389. The District Court ordered the postage refund amounts due to AAL and ABE and entered final judgment in these cases on January 13, 2003 and February 12, 2003. *See AAL v. USPS*, Order (D.D.C. Jan. 13, 2003); *ABE v. USPS*, Order (D.D.C. Feb. 12, 2003).

Appellant first contends that its regulations are not subject to judicial review, because 39 U.S.C. § 410(a) exempts the Postal Service from the judicial review provisions of the Administrative Procedure Act ("APA"). The Postal Service claims further that, if judicial review is proper, the court should defer to the agency's statutory interpretation under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because the regulations reflect a permissible construction of 39 U.S.C. § 3626(j)(1)(B). Appellees, in turn, argue that, because the Postal Service acted in excess of its delegated authority under the statute, judicial review is available outside of the APA and the disputed regulations cannot possibly survive scrutiny under any standard of review.

We affirm the judgments of the District Court. Judicial review is available in this case, because, as appellant concedes, appellees may challenge actions by the Postal Service that are outside of the scope of its statutory authority. Appellees' principal claim here is that the challenged regulations emanated from an *ultra vires* action by the Postal Service. We agree. Therefore, it does not matter whether

39 U.S.C. § 410(a) precludes traditional APA review. On the merits, we hold that the Postal Service's regulations exceed the agency's delegated authority under the statute. The statute permits the agency to regulate solely with respect to "coverage provided by [an insurance] policy." The agency ignored this limitation and focused instead on "types of insurance." "Coverage" under a policy does not mean the "type of insurance" offered. Therefore, the regulations totally pervert the meaning of the statute. And, in so doing, the regulations effectively exclude nonprofit organizations from using the reduced nonprofit postage rate for insurance-related mailings in markets in which they previously had access to the reduced rate. There is nothing in this record to indicate that this was the intention of Congress in enacting 39 U.S.C. § 3626(j)(1)(B). Quite the contrary. Both the clear terms of the statute and the legislative history suggest otherwise.

## I. BACKGROUND

In 1970, Congress enacted PRA, 39 U.S.C. § 101 *et seq.*, which created the United States Postal Service. PRA authorized the Postal Service to charge reduced third-class postage rates to "qualified nonprofit organizations," defined as "religious, educational, scientific, philanthropic, agricultural, labor, veterans, or fraternal organizations or associations not organized for profit and none of the net income of which inures to the benefit of any private stockholder or individual," *former* 39 U.S.C. § 4452(d). *Id.* § 4452(b), (c).

In 1990, Congress amended PRA to place some restrictions on the use of reduced-rate mail. *See* 39 U.S.C. § 3626(j). One such restriction was on mailings promoting insurance policies. Section 3626(j)(1)(B) bars the use of the reduced rate for

> mail which advertises, promotes, offers, or, for a fee or consideration, recommends, describes, or announces the availability of–
>
> . . .
>
> (B) any insurance policy, unless the organization which promotes the purchase of such policy is authorized to mail at the rates for mail under

former section 4452(b) or 4452(c) of this title, the policy is designed for and primarily promoted to the members, donors, supporters, or beneficiaries of the organization, and the coverage provided by the policy is not generally otherwise commercially available[.]

*Id.* § 3626(j)(1)(B). The third condition imposed by this section on the use of the reduced rates for insurance-related mailings – *i.e.,* that "the coverage provided by the policy" be "not generally otherwise commercially available" – is the one at issue here.

In 1992, pursuant to its authority to "adopt, amend, and repeal such rules and regulations as it deems necessary to accomplish the objectives of this title," *id.* § 401(2), the Postal Service issued a final rule after notice and comment, amending its Domestic Mail Manual and construing the language of § 3626(j)(1)(B). *See* 57 Fed. Reg. 28,464, 28,466 (June 25, 1992). The rule, which is codified at Domestic Mail Manual § E670.5.5, states:

The term "not generally otherwise commercially available" applies to the actual coverage stated in the insurance policy, without regard to the amount of the premiums, the underwriting practices, and the financial condition of the insurer. When comparisons are made with other policies, consideration will be given to policy coverage benefits, limitations, and exclusions, and to the availability of coverage to the targeted category of recipients. When insurance policy coverages are compared for the purpose of determining whether coverage in a policy offered by an organization is not generally otherwise commercially available, the comparison will be based on the specific characteristics of the recipients of the piece in question (e.g., geographic location or demographic characteristics).

**Note:** The types of insurance considered to be generally commercially available include but are not limited to: Homeowner's, property, casualty, marine, professional liability (including malpractice),

> travel, health, life, airplane, automobile, truck, motorhome, motorbike, motorcycle, boat, accidental death and dismemberment, medicare supplement (medigap), catastrophic care, nursing home, and hospital indemnity insurance.

*Id.* In the preamble to the notice of proposed rulemaking, the Postal Service stated that the statute

> looks to the "coverage provided by the policy," 39 U.S.C. 3626(j)(1)(B), without any indication that price or the financial conditions or practices of the insurer should modify this rule. The Postal Service also does not believe that the presence of unique elements in a type of policy which is otherwise commercially available is sufficient for a determination that the policy is not commercially available. In the example cited above, the primary focus of the policy was life insurance, rather than coverage to provide strike benefits. Accordingly, in determining whether the policy is commercially available, the policy would be considered life insurance.

56 Fed. Reg. 63,895, 63,896 (Dec. 6, 1991).

Thus, to determine whether "the coverage provided by the policy is not generally otherwise commercially available," 39 U.S.C. § 3626(j)(1)(B), the Postal Service looks to whether the insurance policy fits into one of the broad "types of insurance" (*e.g.*, life, health, automobile) that are commercially available. It does not look to whether the specific terms, extent, elements, or details of the coverage provided in the insurance policy are commercially available. This sweeping regulatory exclusion is overcome only when a mailer demonstrates that an insurance policy that is within a broad type of insurance that is generally commercially available is not commercially available to the specific demographic or geographic group to whom the policy is being targeted and promoted.

Appellee AAL is a nonprofit, tax-exempt organization that offers, among other services, its own fraternal life, medical,

disability, and long-term care insurance to its members. Appellee ABE is a nonprofit, tax-exempt organization affiliated with the American Bar Association ("ABA") that gives charitable grants for legal research, funded through ABE's sponsorship of group insurance policies for ABA members. The group insurance policies that ABE offers to members are underwritten by major insurance carriers. ABA's large membership enables ABE to negotiate coverage for members on more favorable terms than those available in the general insurance market. ABE commonly receives annual dividends on group policies, and members, whose premiums fund the group policies, are entitled to their share of the return of the premium in the form of an insurance dividend, but most of ABE's insureds choose to donate those dividends to ABE for its charitable purposes. Both AAL and ABE are "qualified nonprofit organizations" eligible to mail qualifying matter at reduced nonprofit rates.

After the Postal Service issued the disputed regulations, AAL submitted sample materials and requested written clarification regarding the eligibility of its insurance-related mailings for the reduced rate. The Postal Service determined that AAL's insurance-related mailings were "non-permissible mailings" ineligible for the reduced rate under the new regulations. *See* Letter from R.C. Payne, MSC Manager/Postmaster, USPS, to Donna Beyer, Manager, Record & Employee Mail, AAL (Aug. 27, 1992), *reprinted in* JA 85. AAL appealed and the Postal Service affirmed its decision, stating that "AAL offers insurance (e.g., life, health, long-term care, etc.) which are types of insurance that the Postal Service considers generally commercially available. Also, your arguments that there are unusual benefits attached to some of these policies does not necessarily cause them to be considered not commercially available." *See* Letter from Patricia M. Gibert, Manager, Customer Serv. Support, USPS, to George E. Miller, Counsel for AAL (June 7, 1994), *reprinted in* JA 69, 73. AAL's request for reconsideration was rejected. *See* Letter from John H. Ward, USPS, to Geoffrey W. Peters, Counsel for AAL (July 11, 1996), *reprinted in* JA 11-16.

In a separate administrative action, the Postal Service determined that ABE's insurance-related mailings between March 25, 1991 and December 27, 1993 should not have been mailed at the reduced nonprofit rates, assessed a postage deficiency of $250,041.75 against ABE, and required ABE to pay the regular rates for future insurance-related mailings. *See* Letter from Ken Britton, Manager, Customer Serv. Support, USPS, to Charles Lynch, Executive Dir., ABE (Apr. 7, 1994), *reprinted in* JA 304. ABE appealed the ruling and the Postal Service affirmed its decision, stating that ABE

> offers insurance (e.g., life, health, death and dismemberment, etc.) which are types of insurance that the Postal Service considers generally commercially available.

> Also, your argument that the Endowment's insurance program is promoted solely as a vehicle for soliciting members to contribute money (in the form of insurance 'dividends' or 'experience credits') to fund the Endowment's philanthropic endeavors does not necessarily cause them to be considered not commercially available.

Letter from John J. Sadler, Manager, Rates & Classification Serv. Ctr., USPS, to Richard Littell, Counsel for ABE (July 15, 1994), *reprinted in* JA 318, 320. ABE appealed again unsuccessfully, although the Postal Service subtracted from the postage deficiency the mailings made before the Domestic Mail Manual was amended. *See* Letter from Anita J. Bizzotto, Manager, Bus. Mail Acceptance, USPS, to Richard Littell, Counsel for ABE (Jan. 6, 1997), *reprinted in* JA 188-91.

AAL and ABE filed separate lawsuits in the District Court challenging the Postal Service's actions, alleging, *inter alia*, that the Postal Service "exceeded its statutory authority" in promulgating the postal regulations codified at § E670.5.5 of the Domestic Mail Manual. AAL alleged in its complaint:

> The legislative history of the statute ... makes it clear that the intent of Congress was not to

include insurance such as that offered by fraternal benefit societies within the ambit of the new restrictions on the use of the nonprofit mail permit. The regulations promulgated exceed the scope of the authorizing legislation, contravene the preponderance of legislative history, were not reasonably tailored to accomplish Congress' objective and should therefore be set aside.

AAL's Complaint ¶ 20, *reprinted in* JA 134, 138. ABE alleged in its complaint: "USPS exceeded its authority as granted by the 1990 Act because it adopted a regulation that imposed restrictions on insurance-related mailings not contemplated or authorized by Congress." ABE's Complaint ¶ 21, *reprinted in* JA 325, 333.

The District Court granted partial summary judgment in favor of AAL, and granted summary judgment in favor of ABE. *See AAL* Mem. Op. at 1, JA 157; *ABE* Mem. Op. at 1, JA 384. In *AAL*, the District Court first held that 39 U.S.C. § 410(a) did not preclude judicial review in this case. *AAL* Mem. Op. at 4-6, JA 160-62. On the merits, the District Court held that the Postal Service's regulations "constitute an impermissible reading of the statute." *Id.* at 13, JA 169. The District Court noted that, under the Postal Service's statutory interpretation, "a fraternal organization would have to develop an entirely new, unique category of insurance to provide to its members . . . different than any other insurance provided in the United States." *Id.* at 11, JA 167. The District Court reasoned that

> it is fairly apparent here that Congress did not intend to restrict the type of insurance mailings to only those that would qualify under the exemption to the sort described by counsel. Congress specifically noted that certain nonprofit organizations would continue to be able to qualify for this exemption if they met all of the requirements of a three-part test. The Court is puzzled by this fact, when it appears that no existing category of insurance policy that is provided by a fraternal benefit organization would

> meet the third part of the test. Why did Congress need the other two parts if it intended to disqualify all insurance policies under the third prong? By considering the broad general nature of the policy (e.g. life, home, auto) when determining whether a similar type of insurance policy is not generally otherwise commercially available, Defendant has not interpreted the exemption, it has eviscerated it.

*Id.* at 12-13, JA 168-69. The District Court declared invalid the provision of the Domestic Mail Manual interpreting the statutory phrase at issue. *See AAL* Order (D.D.C. Sept. 13, 2001), *reprinted in* JA 170. The District Court found "the identical analysis" to apply in *ABE*. *See ABE*, Mem. Op. at 6, JA 389.

The instant appeals followed. This court ordered that oral arguments in the two cases be scheduled on the same day and that the parties coordinate briefing. In this court, there was a question as to whether the District Court's orders were final and appealable, since the trial court's initial orders left the amounts owed by the Postal Service to AAL and ABE to be determined. *See AAL Order*, JA 170; *ABE* Order (D.D.C. Sept. 17, 2001), *reprinted in* JA 390. However, just before oral arguments in this court, the District Court issued orders setting the refund amounts due to appellees and entered final judgment in both cases. *See AAL* Order (D.D.C. Jan. 13, 2003); *ABE* Order (D.D.C. Feb. 12, 2003). The Postal Service then promptly filed new notices of appeal and filed motions to consolidate the new and initial appeals in both cases. The motions were granted. Thus, the disputed judgments before this court are indisputably final and appealable.

## II. ANALYSIS

### A. Availability of Judicial Review

The Postal Service first contends that 39 U.S.C. § 410(a) precludes judicial review here, because it explicitly exempts the Postal Service from the judicial review provisions of the APA. Section 410(a) provides, in relevant part, that "no Federal law dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds, including

the provisions of chapters 5 and 7 of title 5 [the APA], shall apply to the exercise of the powers of the Postal Service." 39 U.S.C. § 410(a). The Postal Service claims that the well-established presumption favoring judicial review of administrative action is overcome here by the explicit terms of § 410(a). We disagree. The Postal Service assumes that any right that appellees have to judicial review must arise under the APA. This assumption is mistaken.

There is no doubt that § 410(a) exempts the Postal Service from the strictures of the APA in cases involving the APA's procedural requirements. *See, e.g.*, *Nat'l Easter Seal Soc'y for Crippled Children & Adults v. USPS*, 656 F.2d 754, 766 (D.C. Cir. 1981) (holding that the Postal Service was not required to follow notice and comment rulemaking procedures). It is also established that, in PRA, Congress affirmatively intended to preclude judicial review of the Postal Service's Board of Governors' decisions to appoint and remove the Postmaster General. *See Carlin v. McKean*, 823 F.2d 620, 623 (D.C. Cir. 1987) (declining to decide whether judicial review was available "under the old administrative law principles when Congress has explicitly exempted an agency from the APA's coverage," because the court was "quite certain that Congress intended affirmatively to preclude judicial review of the Governors' decisions to appoint and remove the Postmaster General"). These strictures do not apply in this case, however.

In their complaints, both AAL and ABE allege that, in promulgating the postal regulations at issue, the Postal Service exceeded its statutory authority by imposing restrictions on the use of the nonprofit mail permit that were not authorized by Congress. *See* AAL's Complaint ¶ 20, JA 138; ABE's Complaint ¶ 21, JA 333. It does not matter, therefore, whether traditional APA review is foreclosed, because "[j]udicial review is favored when an agency is charged with acting beyond its authority." *Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988). Indeed, the Postal Service concedes that "this Court has found a narrow exception to [§ 410's] preclusion of review, allowing a court to determine whether an agency was acting outside the scope of its statutory authority." Appellant's Br. 19. "Even where Congress is understood generally to have precluded review, the Supreme

Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction." *Griffith v. FLRA*, 842 F.2d 487, 492 (D.C. Cir. 1988) (citing the leading case, *Leedom v. Kyne*, 358 U.S. 184, 188 (1958) (finding judicial review proper despite statutory preclusion of judicial review, where the NLRB acted "in excess of its delegated powers and contrary to a specific prohibition" in the NLRA)).

Following the reasoning of *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), and its progeny, the case law in this circuit is clear that judicial review is available when an agency acts *ultra vires*. *See, e.g.*, *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). In other words, the APA's stricture barring judicial review "to the extent that statutes preclude judicial review," 5 U.S.C. § 701(a)(1), "does not repeal the review of *ultra vires* actions that was recognized long before, in *McAnnulty . . . .* When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Dart*, 848 F.2d at 224; *see also Reich*, 74 F.3d at 1328. Appellees' claims here, that the Postal Service "exceeded its statutory authority" in purporting to apply the statute, clearly admit of judicial review.

**B. Scope of Review**

Although there is little doubt about the availability of judicial review in this case, a question remains regarding the *scope* of review. As noted above, the Postal Service claims that, if judicial review is proper, the court should defer to the agency's statutory interpretation under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because the agency's interpretation of the statute reflects a reasonable construction of 39 U.S.C. § 3626(j)(1)(B). In particular, the Postal Service contends that, in reviewing whether the agency exceeded its statutory authority in construing the statute, we must confine our inquiry to the question whether the regulation "on its face" violates § 3626(j), and accordingly must limit our analysis to the first ("intent of Congress is clear") step of *Chevron* and not

venture into *Chevron*'s second ("permissible construction") step. Appellant's Br. 25-26. Appellant contends that this is so because the appropriate scope of review is something akin to "that appropriate in mandamus actions," *Nat'l Ass'n of Postal Supervisors v. USPS*, 602 F.2d 420, 432 (D.C. Cir. 1979) ("*National Association*"). Appellant's Br. 2-26.

In *National Association*, which was decided prior to *Chevron*, we held that Congress' intent to vest in the Postal Service broad discretion in setting employee compensation and benefits and to limit judicial oversight of the exercise of that discretion did not mean that the Postal Service's decisions were "entirely insulated from judicial surveillance. Courts can defer to the exercise of administrative discretion on internal management matters, but they cannot abdicate their responsibility to insure compliance with congressional directives setting the limits on that discretion." *National Association*, 602 F.2d at 432. With respect to the matter at issue in this case – the scope of review of Postal Service constructions of PRA – we held that "[t]he judicial role is to determine the extent of the agency's delegated authority and then determine whether the agency has acted within that authority." *Id.* We "owe a measure of deference to the agency's own construction of its organic statute, but the ultimate responsibility for determining the bounds of administrative discretion is judicial." *Id.* at 432-33 (citations omitted). *National Association* thus appears almost as a harbinger of *Chevron*.

Under *Chevron*, "if the intent of Congress is clear," the court "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If "Congress has not directly addressed the precise question at issue," and the agency has acted pursuant to an express or implied delegation of authority, the agency's statutory interpretation is entitled to deference, as long as it is reasonable. *Id.* at 843-44. Although an agency manual often may not purport to carry the force of law, *see Christenson v. Harris County*, 529 U.S. 576, 587 (2000); *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (holding that *Chevron* deference is due only when the agency acts pursuant to "delegated authority" and

the agency action has the "force of law"), the Postal Service's disputed regulations in this case were adopted pursuant to notice and comment rulemaking and undoubtedly were intended to carry the force of law. Thus, the conditions for *Chevron* review are clearly met.

It is unclear whether there is much of a disjunction between the tests enunciated in *National Association* and *Chevron* regarding the scope of review here. It is also unclear whether the scope of review in this case is "mandamus-like," which is an odd moniker under existing law. These questions are abstractly interesting, but ultimately unimportant in the resolution of this matter. *National Association* anticipated *Chevron*'s framing of judicial review of agency statutory interpretation as an inquiry into an agency's delegated authority and its action within that authority. "*Chevron* is principally concerned with whether an agency has authority to act under a statute." *Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995). *Chevron* analysis "is focused on discerning the boundaries of Congress' delegation of authority to the agency; and as long as the agency stays within that delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference." *Id.*; *see also Mead*, 533 U.S. at 226-27 (holding that *Chevron* deference is due only when the agency acts pursuant to "delegated authority"). With these principles in mind, it is evident that the scope of review elaborated in *National Association* is in all important respects perfectly consistent with *Chevron* and *Mead*. And appellant concedes that *National Association* controls the scope of review in this case.

Appellant's suggestion that we must confine our inquiry to the question whether the regulation "on its face" violates § 3626(j), and not venture into *Chevron*'s second ("permissible construction") step, makes little sense under either *National Association* or *Chevron*. An agency construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority. It does not matter whether the unlawful action arises because the disputed regulation defies the plain language of a statute or because the agency's construction is utterly unreasonable

and thus impermissible. In this case, the Postal Service's position seems to be that the disputed regulations are permissible because the statute does not expressly foreclose the construction advanced by the agency. We reject this position as entirely untenable under well-established case law. *See Ry. Labor Executives Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) ("Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.") (emphasis in original); *see also Halverson v. Slater*, 129 F.3d 180, 187 (D.C. Cir. 1997) (quoting *Ry. Labor Executives*, 29 F.3d at 671); *Oil, Chem. & Atomic Workers Int'l Union v. NLRB*, 46 F.3d 82, 90 (D.C. Cir. 1995) (same); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995) ("We refuse . . . to presume a delegation of power merely because Congress has not expressly withheld such power."); *Natural Res. Def. Council v. Reilly*, 983 F.2d 259, 266 (D.C. Cir. 1993) (" '[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*.' ") (alteration in original) (quoting *Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 191–92 (D.C. Cir. 1991)).

## C. The Statutory Question

Appellees' principal claim here is that the challenged regulations emanated from an *ultra vires* action by the Postal Service. We agree. This being the case, the regulations cannot survive judicial review under *National Association* or *Chevron*. We now turn to the merits to explain why the Postal Service's position fails.

It is undisputed that appellees meet the first two statutory criteria in § 3626(j)(1)(B) for mailing their insurance materials at the reduced rate. The only issue is the third criterion: "the coverage provided by the policy is not generally otherwise commercially available." 39 U.S.C. § 3626(j)(1)(B). We must decide whether the Postal Service's regulations, construing this statutory language to exclude mailings promoting

insurance belonging to general "types of insurance" (*e.g.*, life, health, disability) that are commercially available, exceeded the Postal Service's delegated authority under the statute. As we noted at the outset of this opinion, the Postal Service's position finds no support whatsoever in the record of this case.

To repeat what we said at the start: The statute permits the agency to regulate solely with respect to "coverage provided by [an insurance] policy." The agency ignored this limitation and focused instead on "types of insurance." "Coverage" under a policy does not mean the "type of insurance" provided. Therefore, the regulations totally pervert the meaning of the statute. And, in so doing, the regulations defy congressional intent by effectively excluding nonprofit organizations from using the reduced nonprofit postage rate for insurance-related mailings in markets in which they previously had access to the reduced rate. Our judgment in this case is the same whether we analyze the agency's statutory interpretation under *Chevron* Step One or Step Two. "In either situation, the agency's interpretation of the statute is not entitled to deference absent a *delegation of authority* from Congress to regulate in the areas at issue." *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002) (emphasis in original) (citing *Ry. Labor Executives*, 29 F.3d at 671). The Postal Service has no congressionally delegated authority to exclude reduced-rate mailings on the basis of general "types of insurance." We therefore hold that the Postal Service's regulations exceed the agency's delegated authority under the statute.

There are two interrelated reasons why we find no delegated authority for the disputed regulations. First, the plain language of 39 U.S.C. § 3626(j)(1)(B) does not support the Postal Service's decision to broadly exclude general "types of insurance" that are commercially available from eligibility for the reduced nonprofit postage rates. Second, nothing in the legislative history indicates that Congress intended the absurd result that is produced by the regulations. Indeed, the legislative history suggests otherwise.

The natural reading of the statutory phrase, "coverage provided by the policy is not generally otherwise commercially available," 39 U.S.C. § 3632(j)(1)(B), does not accord with the definition of "not generally otherwise commercially available" that appears in the agency's Domestic Mail Manual. The Postal Service's regulations construe "coverage provided by the policy" to refer broadly to "types of insurance," without regard to the terms and exclusions of coverage under the policy, the amount and extent of risk covered under the policy, or the presence of unique elements in a policy. Since the statute does not define "coverage," we must presume that Congress intended to give the term its ordinary meaning. Ordinarily, in the context of insurance policies, the word "coverage" refers to something more specific than the general type of insurance such as life or health insurance; it usually refers to the inclusion or exclusion of specific risks under an insurance policy. *See* 7 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 101:3, at 101-11 (3d ed. 1997). WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 525 (1993) defines "coverage" as "protection by insurance policy: inclusion within the scope of a protective or beneficial plan." THE AMERICAN HERITAGE DICTIONARY 334 (2d Coll. ed. 1982) defines "coverage" as "[t]he extent of protection afforded by an insurance policy." BLACK'S LAW DICTIONARY 372 (7th ed. 1999) defines "coverage" as "[i]nclusion of a risk under an insurance policy; the risks within the scope of an insurance policy." The prior edition of BLACK'S LAW DICTIONARY 365 (6th ed. 1990) defined "coverage" as "amount and extent of risk contractually covered by insurer." We think that the agency's construction of the term "coverage" to mean broadly the general type or category of insurance provided by the policy contravenes the ordinary meaning of "coverage," which normally refers more specifically to the amount and extent of risk included in the scope of a policy. In short, the Postal Service's idiosyncratic use of the word "coverage" has no basis in the ordinary use of term.

The Postal Service's interpretation also leads to an absurd result. As the Postal Service conceded at oral argument, this statutory construction effects a blanket exclusion of nonprofit

organizations from use of the reduced postage rates for insurance-related purposes in markets where nonprofits had previously used the reduced rates. Virtually all insurance-related mailings are disqualified from eligibility under this interpretation. To qualify, a nonprofit organization would have to develop an entirely unique category of insurance that is not commercially available, or offer a generally commercially available type of insurance to a particular group for whom that type of insurance is not commercially available. These potential exceptions to the blanket exclusion are not significant enough to ameliorate the drastic effect of the agency's interpretation: to eliminate nonprofits' access to the reduced postage rates for their insurance-related mailings. Given the extremity of the effect that results from the Postal Service's interpretation, we would expect to see some indication that Congress intended such an effect, but we find no indication in the statute that its goal is to exclude nonprofits from using the reduced postage rates to this extent.

The legislative history also gives no indication that Congress intended such a drastic cutback on nonprofits' use of the reduced mail permit. Indeed, the legislative history indicates that Congress clearly intended to continue allowing nonprofits to promote their services at reduced postage rates. A Senate Appropriations Committee report regarding spending for fiscal year 1990 stated:

> While the Committee continues to support the subsidization of what it considers to be legitimate mailings for the benefit of nonprofit making entities under the provisions of the Postal Reform Act, nonetheless, the Committee shares some concerns about what it considers to be abuses in the revenue foregone program which place the legitimate use of subsidies for legitimate mailings in jeopardy. The Committee believes that the use of nonprofit bulk mailings to advertise . . . insurance or other services clearly for the benefit of commercial profitmaking purposes, particularly where such services have no relation to the nonprofit organization's primary mis-

sion, are improper uses of the preferred mailer status and costly to all taxpayers. For this reason, the Committee has included language in the bill which eliminates the use of the nonprofit mailer permit for these purposes. The Committee recognizes that there are certain nonprofit organizations which provide travel, insurance, and financial services to support the purposes for which the nonprofit organization was originally established. Under the language included in the bill, these organizations will continue to be allowed to use their mailers to promote those services.

S. REP. NO. 101-105, at 43 (1989). The Senate report recommending passage of the final bill stated:

While the Committee continues to support the subsidization of what it considers to be legitimate mailings for the benefit of nonprofit making entities under the provisions of the Postal Reform Act, nonetheless, the Committee shares concerns about what it considers to be abuses in the revenue foregone program which place the use of subsidies for legitimate mailings in jeopardy.

S. Rep. No. 101-411, at 52 (1990). The Postal Service cites this passage in its brief to demonstrate that Congress' primary concern in enacting § 3626(j)(1)(B) was "to reduce the cost of subsidized mailings by nonprofits." Appellant's Br. 29. But these passages indicate that Congress did not intend to eliminate "legitimate mailings" using the reduced rate, such as nonprofits' insurance-related mailings. What Congress apparently did intend to eliminate were "abuses" of the reduced rate, such as their use for cooperative mailings, in which a for-profit and a nonprofit company enter an agreement to market for-profit products or services using the nonprofit mail permit. There is clear evidence that Congress intended for nonprofit organizations that provide insurance policies to "continue to be allowed to use their mailers to promote" their insurance services and make "legitimate mail-

ings for the benefit of nonprofit making entities." S. REP. NO. 101-105, at 43.

The Postal Service contends that the disputed statutory phrase, "coverage provided by the policy is not generally otherwise commercially available," does not speak to the precise issue. For the reasons stated above, we find no real ambiguity when the statutory language is fairly construed using the normal tools of statutory construction. In any event, however, while ambiguity in a statute may imply a "delegat[ion] to the agency [of] the power to fill those gaps," *see County of Los Angeles v. Shalala*, 192 F.3d 1005, 1016 (D.C. Cir. 1999), the agency must still stay within the bounds of the delegation in promulgating regulations under the statute. In this case, the Postal Service has transgressed the bounds of any delegation to fill alleged gaps in the statute, because the statute simply cannot bear the meaning that the Postal Service seeks to give it. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229 (1994) ("[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear . . . ."). The agency lacked authority under the statute effectively to regulate out of the market nonprofits' use of the reduced postage rates for insurance-related purposes. The agency's statutory interpretation and its effect cannot survive *Chevron* Step One because the statutory language and legislative history unambiguously indicate an intent for nonprofts to continue to mail insurance-related material at reduced rates. In the alternative, assuming *arguendo* that the statutory language is ambiguous, the regulations constitute an impermissible construction of the statute under *Chevron* Step Two because the interpretation is utterly unreasonable in the breadth of its regulatory exclusion. There is nothing in this record to indicate that Congress empowered the agency to effect a blanket exclusion of nonprofits from the use of the reduced mail permit for insurance-related purposes.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgments of the District Court.